**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

COLLEEN FINNERTY, an individual,

      Plaintiff,

v.

GOAL ACADEMY, a Colorado nonprofit corporation,

      Defendant.

_____

**COMPLAINT WITH REQUEST FOR JURY TRIAL**
_____

      COMES NOW, the Plaintiff, Colleen Finnerty, by and through her attorney, Thomas H. Mitchiner, Mitchiner Law, LLC, and submits her Complaint and Request for Jury Trial against Defendant, GOAL Academy, and states as follows:

### NATURE OF THE CASE

      This is an employment discrimination case arising from the discriminatory treatment of Colleen Finnerty [Ms. Finnerty] a disabled female by GOAL Academy [GOAL]. The discriminatory and retaliatory practices, based on Ms. Finnerty's disability, include but are not limited to discriminating against Ms. Finnerty concerning the terms and conditions of her employment and constructively discharging her.

      The discriminatory and retaliatory actions violated the Americans with Disabilities Act and the Americans with Disabilities Amendment Act, 42 U.S.C. §§ 12101 *et. seq.* [ADA], and the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et. seq.*

## JURISDICTION AND VENUE

1.      Jurisdiction is asserted pursuant to 28 U.S.C. §§ 1331.

2.      This is an action authorized and instituted pursuant to the ADA and Rehabilitation Act.

3.      Ms. Finnerty's four claims are asserted under the ADA and Rehabilitation Act, alleging violations of, and seeking remedies under the ADA and Rehabilitation Act. The standards for determining employment discrimination under the Rehabilitation Act are the same as under title I of the Americans with Disabilities Act. All references to the ADA, ADAAA, and Rehabilitation Act are collectively referenced as the ADA.

4.      The claims in issue arose in the State of Colorado.

5.      All claims arose in the Judicial District of this Court.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (b) (c).

## PARTIES

7.      Plaintiff, Colleen Finnerty [Ms. Finnerty], a disabled female, is a resident of the State of Colorado.

8.      Ms. Finnerty most recently held the position of Intervention Resource teacher ("IR") at GOAL.

9.      Ms. Finnerty suffers from anxiety and depression.

10.     Ms. Finnerty's Post Traumatic Stress Disorder [PTSD] anxiety and depression impact her ability to deal with change, be out in the public and to work outside of the home.

11.     Defendant, GOAL Academy [GOAL], which is a federally funded public high school designed to provide students with a flexible learning environment.

12.     GOAL is a Colorado nonprofit organization authorized to conduct business

in the state of Colorado and with its principal place of business in Colorado.

13.     Ms. Finnerty worked at GOAL's location in the Town Center at Aurora, 14200 E. Alameda Ave Unit 1003A, Aurora, CO 80012.

14.     Ms. Finnerty is an employee under the ADA.

15.     GOAL is an employer under the ADA

## ADMINISTRATIVE PROCEDURES

16.     Prior to filing this action, Ms. Finnerty timely, properly, and lawfully exhausted all required administrative remedies.

17.     Ms. Finnerty filed a timely charge of disability discrimination and retaliation, actions in violation of the ADA, with the Equal Employment Opportunity Commission [EEOC]. [EEOC Charge No. 541-2021-02531].

18.     On November 17, 2022, the EEOC mailed a Notice of Right to Sue letter to Ms. Finnerty.

19.     This action is timely filed because it is filed within ninety days of Ms. Finnerty's receipt of the Notice of Right to Sue letter issued by the EEOC.

## BACKGROUND

20.     Ms. Finnerty started working for GOAL on or about July 8, 2019, as an Intervention Resource teacher ("IR") at the Town Center of Aurora location.

21.     Throughout her tenure with GOAL, Ms. Finnerty performed her work both virtually and in person for GOAL.

22.     GOAL offered two fifteen-minute breaks for teachers each day in addition to a half-hour break for lunch.

23.     Shortly after starting, during the first week of August 2019, Ms. Finnerty

requested that her two fifteen-minute breaks be merged into one thirty-minute break as a reasonable accommodation for her anxiety.

24.　　A thirty-minute break would allow Ms. Finnerty to go for a walk outside.

25.　　On August 19, 2019, GOAL granted Ms. Finnerty her reasonable accommodation.

26.　　While on break for the holidays in December, a high school-aged person was murdered at J.C. Penny's, located next to the GOAL High School just before the school returned for winter break.

27.　　As a result, the Aurora Police Department increased its presence at the mall and instituted security checkpoints.

28.　　GOAL also implemented active shooter drills and procedures.

29.　　The shooting hurt Ms. Finnerty's mental health.

30.　　Ms. Finnerty shared this with GOAL.

31.　　On January 20, 2020, GOAL issued a statement requiring all IR teachers to take on an additional class load of 50 students.

32.　　Ms. Finnerty had a nervous breakdown in 2018, partly caused by schedule irregularities and other classroom stressors.

33.　　Ms. Finnerty informed GOAL of her nervous breakdown and said that she feared the change in the schedule would negatively impact her mental health.

34.　　GOAL informed her that she was not required to take an additional class because it was only for teachers who wanted to earn extra money.

35.　　On July 20, 2020, Ms. Finnerty received abnormal mammogram results.

36.     Ms. Finnerty scheduled surgery to have the possibly cancerous growth removed.

37.     In early August 2020, Ms. Finnerty informed Jill Boudreau, the Vice Principal, that she would need accommodations after her surgery as she could not lift more than five pounds.

38.     The five-pound restriction meant that Ms. Finnerty could not even carry her laptop into the office.

39.     Ms. Finnerty also reached out to information technologies [IT] to see if they could put a monitor and a keyboard in her workstation.

40.     IT did not have any extra keyboards, so it could not set up an onsite workstation for Ms. Finnerty.

41.     An extra keyboard would have cost less than $100 for GOAL to purchase as an accommodation for Ms. Finnerty.

42.     To accommodate Ms. Finnerty, Ms. Boudreau told Ms. Finnerty to call GOAL each morning when she arrived and that someone would help her move her things into the school.

43.     The proposed accommodation did not work for Ms. Finnerty because she lived on the second floor and needed help to carry her laptop to her car.

44.     Around this time, Ms. Finnerty began to experience panic attacks related to her upcoming surgery and possibly having cancer.

45.     Ms. Finnerty reached out to Kim Nava in Human Resources [HR] and requested that GOAL allow her to work from home as an accommodation for her panic attacks.

46.     Ms. Nava granted Ms. Finnerty's work-from-home accommodation for the remainder of the 2020-2021 school year.

47.     On April 19, 2021, GOAL informed staff that the Goal Forum, a statewide training, would be held in person.

48.     Ms. Finnerty reached out to Lynee Zajac-Beck, the GOAL Orientation Facilitator, to see if she could attend virtually.

49.     Ms. Zajac-Beck told Ms. Finnerty that the Director, Dr. Jones, only allows staff to attend virtually if they have a specific accommodation.

50.     Ms. Finnerty told Ms. Zajac-Beck that she did have an accommodation; however, Ms. Zajac-Beck stated that because it is set to end with the school year, it may not cover the Forum.

51.     Ms. Zajac-Beck instructed Ms. Finnerty to contact RayAnnne Martinez in HR.

52.     That day, Ms. Finnerty reached out to Ms. Martinez and received no reply.

53.     On April 26, 2021, GOAL informed staff during a Denver region staff meeting that all accommodation requests should be submitted through Jill Toussaint, Chief Academic Advisor, and Aaron Perez, Denver Region Principle.

54.     Per the new policy, all accommodation requests would be approved by Mr. Perez and not HR.

55.     That day, Ms. Finnerty emailed a formal accommodation letter for the 2021-2022 school year to Ms. Toussaint and Mr. Perez.

56.     On May 21, 2021, Ms. Finnerty followed up with Ms. Boudreau as she had not heard back from Ms. Toussaint or Mr. Perez.

57.     Ms. Boudreau emailed Ms. Toussaint and Mr. Perez to remind them about Ms. Finnerty's accommodation request.

58.     On May 24, 2021, Mr. Perez responded to Ms. Finnerty's request and told her that it would be reviewed before the next school year and that she should have a response by early June.

59.     Mr. Perez did not address Ms. Finnerty's concerns about having to attend the GOAL Forum in person.

60.     On June 2, 2021, Ms. Finnerty followed up with Mr. Perez about her accommodation, and Mr. Perez responded by saying that it may be a few more weeks.

61.     On June 3, 2021, Ms. Finnerty attended an online meeting for GOAL. The meeting was conducted by the IR Reading Teacher On Special Assignment [TOSA], Veronica Pedraza.

62.     In the meeting, Ms. Pedraza stated that statewide GOAL teachers in Colorado could work from home and did not need to come to the school if their "home site" was fully staffed.

63.     Ms. Boudreau confirmed in writing that the Aurora Mall GOAL site was fully staffed.

64.     Ms. Finnerty understood this statement as relating to her because she had not received any communication from HR or her direct supervisors regarding her accommodations and had recently received a title change to a "statewide" teacher instead of a "site" teacher.

65.     As a "statewide" teacher, Ms. Finnerty was responsible for students that lived outside of Aurora and did not need to come to the site for assistance.

66.     Many of Ms. Finnerty's students utilized GOAL's remote learning platform while living in Ft. Collins, Grand Junction, Pueblo or other locations outside of the Denver-Metro area and Aurora.

67.     In June 2021, the Delta variant of COVID-19 was a significant concern.

68.     Because Ms. Finnerty worked in the Town Center of Aurora and recently had surgery, she was very concerned about contracting the Delta variant.

69.     Ms. Finnerty met with her therapist to discuss how she would remain safe while the new variant spread throughout the community.

70.     Ms. Finnerty's therapist recommended that Ms. Finnerty only works at the Town Center of Aurora for four hours a week and avoids large gatherings throughout the year.

71.     Under this recommendation, Ms. Finnerty would complete the remainder of her 40-hour work week remotely.

72.     Ms. Finnerty would work four hours a week at the Town Center of Aurora and thirty-six hours a week at home.

73.     Ms. Finnerty reached out to GOAL and informed them of her request to work four hours per week on-site.

74.     Around this time, GOAL hired a new Head of HR, Mr. Ron Vigil.

75.     On July 13, 2021, Mr. Perez forwarded Mr. Vigil Ms. Finnerty's accommodation emails.

76.     On July 19, 2021, Ashleigh Holdren, in HR, emailed and informed Ms. Finnerty that she had received an exemption from the in-person Goal Forum.

77. In lieu, Ms. Finnerty worked on-site in the building, organizing the library, on July 28, 2021, and July 29, 2021.

78. A colleague of Ms. Finnerty resigned in mid-July.

79. On July 22, 2021, Ms. Finnerty offered to take on an additional teaching position to fill a gap caused by the resignation.

80. Ms. Boudreau told Ms. Finnerty that she would speak to Mr. Perez on her behalf and that she "had her back."

81. Ms. Finnerty felt supported by Ms. Boudreau and was excited by the potential of the new role.

82. On July 29, 2021, Ms. Finnerty received a TEAMS message from Ms. Boudreau asking if she had heard anything from Mr. Perez about on-site work hours.

83. Ms. Finnerty replied and indicated that she had not; however, she said to Ms. Boudreau that, per her conversation with Ms. Pedraza, she believed that no statewide teachers were required to report in person if the site was fully staffed. Ms. Boudreau confirmed in writing that the Aurora Mall site was fully staffed. Ms. Finnerty also shared the safety plan that her therapist had created.

84. That evening, Ms. Finnerty received two messages from Mr. Perez, one only to her and one to her, Ms. Boudreau, and Ms. Pedraza.

85. In these messages, Mr. Perez clarified that Ms. Finnerty was to work up to four hours per week on-site, effective immediately.

86. Ms. Finnerty asked if she could still assist with Standardized Testing and Reporting [STAR] testing, and Mr. Perez agreed that she could if she was comfortable.

87. Ms. Finnerty felt satisfied with this and agreed to the terms.

88.     On July 30, 2021, GOAL updated its COVID-19 policies and removed all mask and social distancing mandates for students and on-site staff.

89.     Later, while working at GOAL, Ms. Finnerty talked with Ms. Boudreau about her accommodations. Ms. Boudreau told her that Mr. Perez made a mistake when he told her she only had to work four hours a week on-site. Ms. Boudreau told Ms. Finnerty that the requirement was that she works four hours a day on-site.

90.     Ms. Finnerty, shocked, told Ms. Bourdreau that she had two messages from Mr. Perez where he clearly said she could only work four hours per week on-site.

91.     That night, Ms. Boudreau emailed Ms. Finnerty and stated that she would work four hours per day, totaling 20 hours per week on-site.

92.     Following this exchange, Ms. Finnerty filed a formal grievance letter.

93.     On August 4, 2021, Ms. Finnerty met with Mr. Perez, Ms. Boudreau, and Mr. Vigil to discuss the grievance.

94.     To begin the meeting, Mr. Vigil told Ms. Finnerty that if she did not accept the terms laid out in this discussion, her next accommodation would "be a new job."

95.     Mr. Perez then berated Ms. Finnerty for submitting a grievance and going above his head to Mr. Vigil.

96.     Ms. Boudreau then interjected and stated that Ms. Finnerty's accommodation letter had an error and that it should permit her to work four hours per day, not a week, on-site.

97.     Considering that Ms. Finnerty's letter had been written for her and with her needs in mind, Ms. Finnerty disagreed with Ms. Boudreau. She stated that Mr. Perez had already agreed to the accommodation, as written.

98. Mr. Vigil then insisted that another accommodation letter be submitted outlining Ms. Finnerty's four hours per week on-site accommodation.

99. On August 6, 2021, Ms. Finnerty submitted this letter from her therapist.

100. After the meeting on August 4, 2021, Ms. Boudreau sent a Microsoft Teams message to Ms. Finnerty indicating that she had three candidates for the position Ms. Finnerty had agreed to take on for the coworker that resigned.

101. Ms. Boudreau said she would be moving ahead with another candidate, despite never allowing Ms. Finnerty to interview or officially apply with the other candidates.

102. Later that same day, Ms. Finnerty attended a virtual staff meeting with all staff members who reported to Ms. Boudreau. As the session ended, Ms. Finnerty heard an individual say, "Coming in and only working from 9 am-10 am, can you imagine?" followed by laughter.

103. Ms. Finnerty knew that the coworkers were talking about her.

104. Ms. Boudreau heard the comments but made no efforts to end this conversation or alert staff that discussing other employees' accommodations is a HIPPA violation.

105. Between August 4, 2021, and August 12, 2021, Ms. Finnerty used a significant amount of her paid time off [PTO] allotment for the year.

106. No HR or GOAL leadership member reached out to her to discuss her accommodation request during this time.

107. Ms. Finnerty felt that the expectations and scheduling related to her role needed to be clarified.

108.   On August 12, 2021, Mr. Vigil and Ms. Boudreau contacted Ms. Finnerty's therapist to schedule a meeting.

109.   Ms. Finnerty received no invite to this meeting and was not a part of any discussions.

110.   According to Ms. Finnerty's therapist, Mr. Vigil and Ms. Boudreau were dismissive of Ms. Finnerty's needs and accommodations during this call.

111.   When the therapist pushed back and supported Ms. Finnerty's requests, Mr. Vigil argued with her and stated that only Mr. Perez could make accommodations for Ms. Finnerty.

112.   When she heard this, Ms. Finnerty's therapist asked why Mr. Perez was not at this meeting to discuss Ms. Finnerty's accommodations.

113.   At the end of this meeting, no resolution was reached, and Ms. Finnerty's therapist received no advice on the next steps.

114.   Mr. Perez was not at the meeting because he was on bereavement leave.

115.   On August 13, 2021, Ms. Finnerty participated in a short meeting with Ms. Boudreau, Ms. Holdren, and Mr. Vigil.

116.   During this meeting, the trio placed Ms. Finnerty on a two-week probation so they could determine the outcomes of her accommodation and decide whether she could remain in the same position at GOAL or with GOAL at all.

117.   This struck Ms. Finnerty as odd since she had been told that only Mr. Perez could make these decisions, and he was not a part of the meeting.

118.   While Ms. Finnerty asked questions at the end of the meeting, the meeting was adjourned, and few of Ms. Finnerty's questions were answered.

119.    Leaving this meeting, Ms. Finnerty understood that she had been granted a two-week accommodation for the four-hour-per-week on-site schedule.

120.    It remained unclear what would happen at the end of the two weeks or if she was correct in assuming she could work the four-hour-per-week schedule during that time.

121.    Following the abrupt end of the meeting and not being clear on the expectations, Ms. Finnerty sent a follow-up email to Mr. Perez, Ms. Boudreau, Ms. Holdren and Mr. Vigil.

122.    No one replied to Ms. Finnerty's email.

123.    Ms. Finnerty sent another follow-up email and stated that she believed GOAL was trying to force her to quit.

124.    On August 16, 2021, three days after Ms. Finnerty had reached out, Ms. Bourdreu replied and stated that Mr. Perez would be in touch once he returned to the office the week of the 23rd and that she would not hear anything until then.

125.    On this same day, Ms. Finnerty requested, via email, that Ms. Boudreau produce a copy of the GOAL handbook.

126.    Nobody ever reached out to Ms. Finnerty that week or the following.

127.    Since she had been placed on probation, Ms. Finnerty wanted to clarify which specific policy she had broken.

128.    Ms. Boudreau stated that one did not exist and that she would reach out to Mr. Vigil.

129.    On August 17, 2021, Ms. Finnerty worked two hours on-site per her meeting on August 13, 2021.

130.	On August 18, 2021, just two days after being told that no employee handbook existed, a manual was created and sent to staff.

131.	The manual included a "New Information Related to ADA" section.

132.	On August 19, 2021, Ms. Finnerty used PTO for her two-hour on-site day.

133.	On August 20, 2021, Ms. Finnerty discovered that she had been exposed to COVID-19 from a co-worker earlier in the week.

134.	On August 23, 2021, Ms. Finnerty met with Joseph Cosgrove at the Equal Employment Opportunity Commission to discuss her situation and possible avenues for relief.

135.	Later that same day, after waiting to hear back from Mr. Perez, or anyone at GOAL for weeks, Ms. Finnerty submitted her letter of resignation to GOAL.

**First Claim for Relief**
(Americans with Disabilities Act – 42 U.S.C. §§ 12101)

136.	The foregoing allegations are realleged and incorporated by reference.

137.	At all times in issue, Ms. Finnerty performed her duties in a satisfactory manner.

138.	At all times in issue, Ms. Finnerty did not engage in any conduct warranting the discriminatory adverse actions described herein.

139.	GOAL discriminated against Ms. Finnerty because of her disabilities, anxiety, depression and PTSD, by intentionally depriving Ms. Finnerty of her right to be free from disability discrimination in the performance, enjoyment, continuation, rights, benefits, and privileges of her employment relationship with the GOAL.

140.	The ADA applies to Ms. Finnerty and GOAL.

141.	GOAL discriminated against Ms. Finnerty because of her disability: (a) with

respect to her terms, conditions, or privileges of employment; and/or (b) by limiting, segregating, or classifying Ms. Finnerty in a way, which deprived, or tended to deprive, Ms. Finnerty of employment opportunities, or otherwise adversely affect her status as an employee.

142.    GOAL engaged in continual, increasing, and intentional disability discrimination in taking adverse unlawful employment practices against Ms. Finnerty because of her disability.

143.    GOAL disciplined Ms. Finnerty, by taking away the position she had agreed to take on as a result of resignation and placing her on a two-week probation.

144.    GOAL did not discipline and/or alter the terms and conditions of other employees' employment, not of Ms. Finnerty's protected class for working remotely.

145.    GOAL forced Ms. Finnerty to take involuntary PTO.

146.    GOAL told Ms. Finnerty that she had to be placed on a two-week probation because of the investigation into her accommodation requests.

147.    GOAL required Ms. Finnerty to work during the two-week probation and to be onsite for four hours per week.

148.    GOAL threatened that at the end of the two weeks, Ms. Finnerty may or may not be able to stay at GOAL.

149.    GOAL did not require coworkers of Ms. Finnerty's to be placed on probation before granting them the ability to work remotely.

150.    GOAL had no basis for forcing Ms. Finnerty to take a two-week probation.

151.    The two-week probation was colored by the inaccurate and biased information GOAL decided to believe about Ms. Finnerty's need for an accommodation.

152.    GOAL referenced no policies or procedures that Ms. Finnerty had violated to be placed on probation.

153.    GOAL did not provide Ms. Finnerty with a copy of the GOAL employee handbook because one did not exist.

154.    Once Ms. Finnerty requested a copy of the handbook, one was created with an addendum to ADA accommodations.

155.    GOAL constructively discharged Ms. Finnerty on or about August 23, 2022.

156.    By taking months to approve Ms. Finnerty's simple accommodation request, GOAL created conditions so intolerable that no reasonable person would have stayed under the circumstances.

157.    Moreover, GOAL told Ms. Finnerty that if she did not accept the accommodations, it proposed her next accommodation would be a new job.

158.    Ms. Finnerty could not accept the accommodations as proposed by GOAL, her working four hours onsite per day and therefore knew GOAL would terminate her.

159.    GOAL acted willfully, with malice or reckless indifference to the rights of Ms. Finnerty.

160.    As a result of GOAL's actions Ms. Finnerty suffered damages in an amount to be proved at trial.

## Second Claim for Relief
(ADA Retaliation – 42 U.S.C. § 12203)

161.    The foregoing allegations are realleged and incorporated by reference.

162.    On or about July 29, 2021, Ms. Finnerty and GOAL agreed that Ms. Finnerty would be allowed to work four hours per week on-site.

163.    Ms. Finnerty asked GOAL to make the agreement that she could work four

hours per week on-site as a reasonable accommodation for her anxiety, depression, and PTSD.

164.    On July 30, 2021, Ms. Boudreau approached Ms. Finnerty at the GOAL site and told her that Mr. Perez had made an error in granting her four-hour on-site per week accommodation.

165.    Ms. Boudreau stated that Ms. Finnerty would be required to work four-hours per day on-site.

166.    Ms. Finnerty told Ms. Boudreau that she had two separate messages indicating that she was to work four hours per week on-site.

167.    That night, Ms. Boudreau emailed Ms. Finnerty and again stated that she would be working four hours per day on-site, not four hours per week on-site.

168.    After receiving this email, Ms. Finnerty filed a formal grievance.

169.    On August 4, 2021, a meeting was held to address Ms. Finnerty's grievance. Mr. Vigil began the meeting by telling Ms. Finnerty that if she did not accept the terms laid on in the discussion, then her "next accommodation would be a new job."

170.    At the end of the meeting, it was requested that Ms. Finnerty submit another copy of her accommodation letter. Ms. Finnerty requested the letter from her therapist following the meeting and submitted it within the same work week.

171.    After the meeting on August 4, 2021, Ms. Boudreau sent a Microsoft Teams message to Ms. Finnerty indicating that she had three candidates for the position Ms. Finnerty had agreed to take on for the coworker that resigned. Ms. Boudreau said she would be moving ahead with another candidate, despite never allowing Ms. Finnerty to interview or officially apply with the other candidates.

172. On August 13, 2021, Ms. Finnerty participated in a short meeting with Ms. Boudreau, Ms. Holdren, and Mr. Vigil. During this meeting, the trio placed Ms. Finnerty on a two-week probation so they could determine the outcomes of her accommodation and decide whether or not she could remain in the same position at GOAL or with GOAL.

173. Following the abrupt end of the meeting and not being clear on the expectations, Ms. Finnerty sent a follow-up email to Mr. Perez, Ms. Boudreau, Ms. Holdren and Mr. Vigil.

174. No one replied to Ms. Finnerty's email. Ms. Finnerty sent another follow-up email and stated that she believed GOAL was trying to force her to quit.

175. On August 16, 2021, three days after Ms. Finnerty had reached out, Ms. Bourdreu replied and stated that Mr. Perez would be in touch once he returned to the office the week of the 23rd and that she would not hear anything until then. Nobody ever reached out to Ms. Finnerty that week or the following.

176. On this same day, Ms. Finnerty requested, via email, that Ms. Boudreau produce a copy of the GOAL handbook. Since she had been placed on probation, Ms. Finnerty wanted to clarify which specific policy she had broken.

177. On August 19, 2021, Ms. Finnerty used PTO for her two-hour on-site day.

178. Ms. Finnerty participated in an Equal Employment Opportunity [EEO] process by requesting reasonable accommodations.

179. Ms. Finnerty opposed what she believed to be discriminatory practices by GOAL in her emails to it where she informed it that the accommodations requested were valid and that she believed it was trying to force her to quit.

180. GOAL subjected Ms. Finnerty to an action that a reasonable employee

would have found materially adverse when it first granted and then rescinded her accommodation and later when it placed her on probation.

181.    GOAL further subjected Ms. Finnerty to an action that a reasonable employee would have found materially adverse, when it continually asked her to submit the same paperwork that had been submitted previously.

182.    A reasonable employee would have considered Ms. Finnerty's constructive discharge, being placed on probation, and being badgered by GOAL to submit documents she had already completed as being materially adverse.

183.    A causal connection exists between Ms. Finnerty's constructive discharge and her complaints because it occurred just days after she had been placed on probation.

184.    GOAL acted willfully, with malice or reckless indifference to the rights of Ms. Finnerty.

185.    As a result of GOAL's actions Ms. Finnerty suffered damages in an amount to be proved at trial.

### Third Claim for Relief
(Americans with Disabilities Act -Regarded As – 42 U.S.C. §§ 12101)

186.    The foregoing allegations are realleged and incorporated by reference.

187.    The ADA's definition of disability and discrimination includes discrimination against a person based on the person being regarded as having a physical or mental impairment that substantially limits one or more major life activities of such individual. 42 U.S.C. Section 12101(2) (A).

188.    An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he has been subjected to an action prohibited by the ADA because of an actual or perceived physical or mental impairment whether or

not the impairment limits or is perceived to limit a major life activity.

189. Ms. Finnerty meets the standard of being regarded as having a physical or mental impairment under the ADA, she suffers from PTSD, anxiety and depression.

190. At all times, Ms. Finnerty was a "qualified individual" under the ADA.

191. Ms. Finnerty was an individual who, with or without reasonable accommodation, could perform the essential functions of the employment position she held with Defendant.

192. Defendant engaged in intentional, willful, and unlawful disability discrimination against Ms. Finnerty in violation of the ADA and Rehabilitation Act, based on the Defendant regarding Ms. Finnerty as having a physical or mental impairment that substantially limits one or more of her major life activities of such individual.

### Fourth Claim for Relief
(Americans with Disabilities Act – Failure to Accommodate – 42 U.S.C. §§ 12101)

193. The foregoing allegations are realleged and incorporated by reference.

194. Ms. Finnerty asserts a claim for the denial of her requested accommodation.

195. The ADA forbids discrimination against a "qualified individual on the basis of disability." 42 U.S.C. § 12112(a).

196. Prohibited discrimination includes not making reasonable accommodations. 42 U.S.C. § 12112(b)(5)(A).

197. The ADA defines disability as "a physical or mental impairment substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A).

198. Ms. Finnerty is a qualified individual with a disability.

199. Defendant denied Ms. Finnerty's request for a reasonable accommodation in the form of not allowing her to work remotely.

200.    Defendant denied Ms. Finnerty's request without entering into the interactive process with her in good faith.

201.    Defendant cannot meet its burden that granting Ms. Finnerty's accommodation would have posed an undue burden on it or posed a direct threat.

202.    GOAL allowed other "statewide" teachers to work from home.

203.    Defendant knew of Ms. Finnerty's disabilities and her request for a reasonable accommodation.

204.    Defendant unreasonably failed to provide Ms. Finnerty the reasonable accommodation.

205.    Moreover, it took Defendant months to review the accommodation she requested, even though it had granted her the same accommodation during the previous school year, and despite the fact that GOAL had a policy allowing statewide teachers to work from home if the site they usually worked at was fully staffed.

206.    Defendant's refusal to provide the reasonable accommodations in issue to Ms. Finnerty, constitutes intentional, willful, and unlawful disability discrimination in violation of the ADA and Rehabilitation Act.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, Colleen Ms. Finnerty, respectfully prays for a judgment to be entered against GOAL Academy as follows:

A.    Against GOAL Academy for back pay, loss of benefits, and all economic benefits associated with Ms. Finnerty's employment, under ADA and Rehabilitation Act, as allowed by law;

B.    Against GOAL Academy for front pay under ADA and Rehabilitation Act, as

allowed by law;

        C.    A finding that GOAL Academy willfully violated ADA and Rehabilitation Act and for compensatory and punitive damages available to Ms. Finnerty, under ADA and Rehabilitation Act, as allowed by law;

        D.    Against GOAL Academy finding that it retaliated against Ms. Finnerty in violation of the ADA and Rehabilitation Act

        E.    Against GOAL Academy for attorney fees and costs available to Ms. Finnerty, under the ADA and Rehabilitation Act, as allowed by law;

        F.    To award Ms. Finnerty all other legal and equitable relief, to which Ms. Finnerty is entitled pursuant to any law, that this Court deems just, equitable, and proper.

## **JURY TRIAL REQUEST**

        Pursuant to Fed. R. Civ. P. 38 (a) (b) (c), and all applicable laws providing for a right to trial by jury, Ms. Finnerty seeks a jury trial of all claims and issues in this action.

Respectfully submitted on February 13, 2023,

By:

Mitchiner Law, LLC

/s/ Thomas H. Mitchiner
Thomas H. Mitchiner
Mitchiner Law, LLC
1240 S. Parker Rd. Suite 103
Denver, CO 80231
Phone: 720-538-0371
E-mail: tmitchiner@mitchinerlawllc.com

Attorney for Colleen Finnerty

Address of Plaintiff: